[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a habeas corpus petition brought by Angelo Joyner (hereafter "Petitioner") initially on May 20, 1993, with subsequent amendments, against the Warden of a Connecticut State Correctional Facility (hereafter "Warden" or "Respondent") claiming that he was denied effective assistance of counsel in violation of his rights under the Sixth Amendment to the United States Constitution and the Eighth Amendment to the Connecticut Constitution. As part of his claim, he alleges that his attorney, Samuel Dixon of New Haven, (hereafter "Dixon") who represented him at the hereinafter described criminal trial had a conflict of interest the extent of which was unknown either to him or the trial court and that at time of trial, this conflict adversely affected Dixon's representation of him. Petitioner is seeking, inter-alia, that his hereinafter described convictions and sentences be vacated and that he be granted a new trial.
Petitioner was arrested by New Haven police in the early morning hours of March 3, 1989 and charged with one count of assault in the first degree, three counts of sexual assault in the first degree and one count of kidnapping in the first degree all against Laura Bergman, (hereafter "Bergman"), and after a jury trial in the New Haven Judicial District, Docket No. 89-303622,Schimelman, J., presiding, (hereinafter "criminal case"), which lasted from June 4, 1991 through June 28, 1991, the Petitioner was found guilty on all counts.
The Petitioner raised at trial a defense of mental disease or defect, (a.k.a. not guilty by reason of insanity) which was unsuccessful. Petitioner claims that he and Bergman lived together, that they had often had consensual sexual relations, and had frequently and together taken drugs, including cocaine and heroin and imbibed alcohol to excess. He claims that the sexual relations on March 2, 3, 1989 were consensual, and that following the sexual relations, a fight had broken out between CT Page 8529 Bergman and him when he told her he was leaving her to marry one, Dorothy Crimely. He further claims that Dixon did not adequately present a defense that the sex was consensual. Bergman testified at the criminal trial that she merely allowed Petitioner to sleep on the living room couch because he was homeless and that they had never had consensual sex. Petitioner claims, inter-alia, that Dixon did not properly investigate the situation prior to going forward with the mental disease/defect defense instead of a consent defense, and if he had investigated properly, he would have found additional information that could have been used to attack Bergman's credibility and that he then should have used a consent defense.
On July 26, 1991, the court, Schimelman, J., sentenced the Petitioner to a total effective sentence of fifty years in prison. Petitioner's appeal to the Supreme Court was denied,State of Connecticut v. Joyner, 225 Conn. 450 (1993). He remains in the custody of the Respondent.
This court heard several pre-trial discovery motions as didSferrazza, J. prior thereto. In September, 1995, this court was assigned to hear this petition, Judge Sferrazza having been transferred to the Windham Judicial District. On or about September 15, 1995 this court heard Dixon's motion to quash his subpoena which was actually taken over by the Respondent because Dixon was not a party, but merely a witness, at that time. The motion to quash was denied. Dixon had also been the Administrator of the Estate of Amos Joyner, Sr., Petitioner's late father, who had died in an automobile accident on December 6, 1986. Dixon was appointed Administrator on February 25, 1987. Petitioner, in the habeas proceeding, claimed that Dixon had mishandled the estate and that neither he nor his three siblings had received the full amount due each of them in the amount of $22,739.21; that in fact Dixon had used these funds for his own purposes. On September 15, 1995, Dixon advised this court and the parties that he customarily threw out all of his checks that were more than three years old. Nonetheless, the court ordered him to furnish Petitioner's counsel, Attorney Denise Ansell, with written authorization to obtain the records of his accounts at Shawmut Bank so that Attorney Ansell would have copies in time to take Dixon's deposition scheduled for November 2, 1995. Suffice it to say that Dixon failed to comply with the time limit to provide the authorization and provided it only after the state's attorney for the Respondent, Christopher Alexy, had urged him to do so. Since the authorization was not received in time, the deposition CT Page 8530 was canceled. This court then ordered Attorney Ansell to obtain the bank records and ordered both Attorneys Ansell and Alexy to subpoena Dixon for a court appearance in this habeas matter for December 5, 1995. Although Attorney Ansell's representative was unsuccessful in serving the subpoena, Attorney Alexy did have the subpoena served. According to Attorney Alexy, Dixon called him the morning he was served to ask about it, to which Alexy responded that he, Dixon, had to be in court. The service of the subpoena was verified by the written affidavit of the officer who served it. Despite this, Dixon failed to show up for the court hearing. As a result, this court issued a capias for Dixon which was never successfully served. In February 1996, the court received a call from Attorney David Lynch of the law firm of Lynch, Traub, Keefe and Errante, of New Haven, who stated that he would have Dixon, whom he now represented, in court on February 21, 1996. On that date Dixon did not show up claiming an emergency although Attorney Lynch was present. When Dixon finally did appear on February 29, 1996 and took the witness stand, to all questions he invoked his privilege under the Fifth Amendment to the United States Constitution not to incriminate himself. His explanation through his attorney for his not honoring the subpoena was that he had turned it over to Attorney Lunch's partner with the words "take care of this, get it quashed." This court did not accept this excuse knowing that Dixon had already known this court's prior ruling denying an earlier motion to quash a subpoena of him.
The bank records had, nevertheless, been obtained, and this court commenced the actual trial on March 3, 1996 and heard evidence on the following dates as well, all in 1996: March 10, May 2, 9, 10, 14, 17;[1] September 13, 19, 20, 26 and 27; October 3, 10, 24, 25 and 31 and November 1, and 15. With substantial time between the closing of evidence and the transcripts of the trial being completed final briefs did not arrive until June 6, 1997.
The court also heard argument on whether to take Judicial Notice of Judge Keyes' (Probate Judge) decision on August 18, 1997.
Before addressing the major issues of law herein, the court will address Respondent's claim that because Petitioner failed to raise the conflict of interest claim in the trial court, Petitioner should be precluded from presenting such a claim in his habeas petition. Respondent cites Johnson v. Commissioner,
CT Page 8531218 Conn. 403, 417 (1991) to the effect that the court "adopted the federal `cause and prejudice' standard from Wainwright v.Sykes, 433 U.S. 72 (1977)." "The Wainwright standard requires that the Petitioner show good cause for the failure to preserve a claim at trial and actual prejudice resulting from the alleged constitutional violation." See Giannotti v. Warden,26 Conn. App. 125, 129 (1991). Good cause was shown in this habeas case. First, Petitioner, who is not an educated, bright or sophisticated individual, did not know the extent of Dixon's conflict, Dixon's theft of the proceeds of the estate didn't become known until Petitioner's counsel made him aware of it during the habeas trial, which he commenced originally with a pro se petition. Although admittedly the issue was raised by the state at the criminal trial, and Petitioner "waived" the conflict, he did not know the extent of the conflict or how it might affect him.
On May 30, 1991, the state filed a Motion to Disqualify Counsel (Pet. Exh. U). The state claimed that Dixon is executor of the Estate of defendant's (Petitioner's) father, the victim has filed a civil action against the defendant and has lodged a pre-judgment attachment of the proceeds of the Estate; Dixon is also a claimant of the monies in the Estate for his attorney's fees in the criminal case; that a conviction in the criminal case would conclusively establish liability in the civil case, thereby entitling the victim to damages which would reduce the amount of money available to Dixon. The motion further alleges that Dixon "appears to have a financial stake in the outcome of this case which might be in conflict with the interests of the defendant."
A hearing was held in the criminal case by Schimelman, J. on this motion on June 4, 5, 6, 1991. In response to the court's question, Dixon lied by claiming the Probate Court order to disburse the funds of the Estate was prior to May 18, 1989 when in fact it wasn't until at least May 26, 1989 when the accounting was approved (or 30 days later if you allow time for an appeal of the Probate order to be taken). He further told the court that he had already disbursed the funds and that he was holding nothing at that point, June 4, 1991. CT June 4, 1991 p. 18. The court pointed out to Petitioner the following potential conflicts:
(1) A prejudgment remedy was issued against Dixon as a garnishee, meaning that the court (Meadow, J.) believes that Dixon may be holding certain funds which are now at issue, i.e. whether the plaintiff in the civil action or Dixon should receive the funds. CT Page 8532
(2) Petitioner is represented by Dixon in the civil case as well as the criminal case; the state is claiming that because Dixon has a financial interest in this case because it may affect the civil case, "the claim could be made . . . that you, Mr. Joyner, did not get 100 per cent from Mr. Dixon in the criminal case because of these other alleged interests. Now, I hasten to add, Mr. Joyner, I'm not saying that that is the case or not the case, and I'm not suggesting for a moment any impropriety on the part of Mr. Dixon . . ." CT pp. 26-28 specifically; pp. 26-37 generally. Judge Schimelman then had the petitioner meet privately with the Public Defender to discuss the conflict with him.
The Petitioner did meet with the Public Defender, Donald Dakers. Attorney Dakers advised the court, CT, June 5, 1991, p. 6, that Petitioner was well aware of the potential conflict asstated in the state's motion. The court indicted that it would give Petitioner time to decide whether he wanted to waive "theconflict that the court and now Mr. Dakers has explained to youand, obviously Mr. Dixon has also previously explained toyou . . ." emphasis added. The court was clearly referring to the conflict as contained in the state's motion. CT June 5, 1991 p. 11. On June 6, 1991, Petitioner indicated to Attorney Dakers who then told the court that he wants to continue to be represented by Dixon, but he does not want to waive his right to a conflict free attorney. "He does not believe in his own mind that there is a conflict, but assuming that there is, he does not wish to waive it." CT June 6, 1991, p. 4. "He believes it's speculation that he be convicted and that this motion as to the basis of the conflict he believes to be mere speculation." This, of course, put Judge Schimelman in a difficult position. He did not know that Dixon had lied to him and further he knew only of the conflict described in the motion. Petitioner later said that "in my mind, if you take my attorney, that's theft. I paid for this attorney" p. 10. He again refused to waive his rights. Then Petitioner talked with Dixon, (the real culprit on this issue) who then reported to the court that Petitioner would waive. Petitioner did then waive but then said ". . . I'm being forced to waive. . . ." After a further explanation by the court, he stated again that he was being forced to waive. He explained that he didn't want to give up his right to appeal based upon what was in the motion. p. 15. Finally, after further explanation by the Court, Petitioner waived any claim to conflict free representation as the court stated "based upon what we have talked about" emphasis added, and CT Page 8533 Petitioner agreed no one was forcing him to do anything. p. 17. The court then found a voluntary waiver "based upon theallegations set forth in the State's motion and the statements by the Court. . . ." emphasis added. CT June 6, 1991 p. 18.
It is clear to this court that no one except Dixon was aware of the extent or true nature of the conflict. As described in the hearing before Judge Schimelman the conflict would appear to be that Dixon, by gaining an acquittal for the petitioner, would then have a better chance of winning the civil case or by Petitioner being found guilty would probably lose the civil case. His fee being free from garnishment would be more likely if he won an acquittal. Therefore, it appears that based upon that scenario, the Petitioner's interest and Dixon's interest in gaining an acquittal are more the same as opposed to being in conflict.
However, as stated above, this was not the real conflict. The Petitioner, Judge Schimelman to whom Dixon had already lied, and the state's attorney, none of them were aware that Dixon had taken Petitioner's money due him from the Estate in January 1989, long before the incident giving rise to Petitioner's arrest on March 3, 1989; that Dixon had forced his representation on Petitioner, and that he had already failed to properly investigate the case before trial and would later refuse to obtain civilian clothes for Petitioner, as well as other effects Dixon's real conflict, further described hereafter, would have on the criminal trial. As can be seen by Petitioner's answers to Judge Schimelman's questions, CT June 4, 1991 pp. 29, 36 and 37, Petitioner did not fully understand what Judge Schimelman was saying at that time, which is not surprising in view of his limited education, his limited intelligence and lack of sophistication. Petitioner didn't know that Dixon had lied to him repeatedly, that he had illegally taken money from the estate, and he didn't know all of the aspects of the conflict described above and hereafter. By the time the issue of potential conflict was raised at the criminal trial, Petitioner believed he had already retained Dixon and Petitioner was without money, Dixon having told him that his part of his father's estate had already been attached by the victim in a civil action contrary to what Dixon told Judge Schimelman. The fee arrangement is unclear, there being no fee agreement or even billing by Dixon at that point. Petitioner trusted Dixon and was in a very difficult position to obtain another private attorney at this stage of the proceedings. As for the conflict, unbeknownst to Petitioner, it CT Page 8534 was being perpetrated by the very attorney who was representing him and to whom he was listening. In the few appearances before this court, Dixon appeared to be very slick, smooth, articulate and persuasive, especially to one who does not know his true character or lack of credibility which will be described hereafter. As for failing to raise the fact that Petitioner appeared at the criminal trial in "prison garb", (described hereafter), Petitioner had asked Dixon to obtain civilian clothes for him, and Dixon had refused. In addition, the failure to raise this issue at trial was due to the self motivation[2] resulting from the conflict by Dixon who is the very subject of the ineffective assistance of counsel claim. Petitioner himself could not have raised it. He trusted Dixon to speak for him, and Dixon controlled the defense. At one point, Dixon refused to allow Petitioner to answer one of Judge Schimelman's questions regarding his right to testify by responding with: "Last I looked, I'm still counsel of record for the defendant."[3]
It is, therefore, very clear to this court that Petitioner did not waive, voluntarily or not, the real conflict of interest by Dixon as hereinbefore and as hereafter described. Accordingly, the waiver is of no value. The good cause for not raising the conflict himself or by Dixon and for waiving it when the state made its motion is the reasons hereinbefore described. The prejudice has already been shown and there will be elaboration of it hereafter. Further, Dixon's or any other attorney's conflict is central to a claim of ineffective assistance and is properly before this court in a habeas proceeding. For the foregoing reasons, this court rejects Respondent's claim that Petitioner should be precluded from raising these issues, and would note that this is the first time Respondent has raised this claim in the habeas proceeding before this court.
STANDARD OF REVIEW:
A. CONFLICT OF INTEREST
1. The "right to counsel is the right to the effective assistance of counsel". Strickland v. Washington, 466 U.S. 668, 686 (1984). Further, a criminal defendant is entitled to be represented by an attorney free from conflicts of interest. See State v. Williams,203 Conn. 159, 166-67 (1987); Holloway v. Arkansas, 435 U.S. 475,483, n. 5 (1978); State v. Martin, 201 Conn. 74, 78 (1986).
2. "In order to establish a violation of the Sixth Amendment, a CT Page 8535 defendant must show that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan,446 U.S. 335, 350 (1980) also, see Lopez v. Scully, 58 F.3d 38,41, 43 (2d Cir. 1995).
3. Prejudice will be presumed where there is an actual conflict of interest that adversely affected performance. Cuyler v.Sullivan, supra; Phillips v. Warden, 220 Conn. 112 (1991). "Once the Petitioner establishes an actual conflict, he need not prove prejudice, but simply a lapse in representation resulting from the conflict." (Emphasis added.) Phillips v. Warden,23 Conn. App. 63, 70 (1990), citing United States v. Iorizzo, 786 F.2d 52,58 (2d Cir. 1986).
4. Cuyler and Phillips, supra do not require the prong ofStrickland, that the Petitioner must show that absent the ineffective assistance, there is a reasonable probability that the outcome of the trial would have been different.
5. In Government of the Virgin Islands v. Zepp, 748 F.2d 125 (3rd Cir. 1984) the court held that conflict of interest goes beyond multiple representation. Conflict can also be between the interests of the defendant and his trial counsel.
6. In Kimmelman v. Morrson, 477 U.S. 365, 381 n. 6 (1986), the court found that "ineffective assistance is `presumed' . . . where counsel is burdened by an actual conflict of interest."
7. Glasser v. United States, 315 U.S. 60, 76, 92 (1942) required more; namely that a defendant must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. It went on to say, however, that once a conflict of interest had been established, the court would not "indulge in nice calculations as to the amount of prejudice" attributable to the conflict. The conflict itself demonstrated a denial of the "right to have the effective assistance of counsel." Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.
8. Under Kimmelman, supra, a defendant must only show a conflict of interest. Cuyler, Glasser and Phillips require the defendant to also show that the conflict adversely affected the attorney's performance. However, reading Glasser's rejection of"nice calculations as to the amount of prejudice", we should also not CT Page 8536 indulge in nice calculations as to how much the conflict adversely affected performance.[4]
9. Notwithstanding Kimmelman, supra, this court will adopt the more stringent view set forth in Cuyler, Glasser and Phillips and require that the defendant prove, by a preponderance of the evidence, that:
 a) there was an actual conflict of interest in Attorney Dixon's representation of the Petitioner and that,
b) such conflict adversely affected Dixon's performance.
B. INEFFECTIVE ASSISTANCE OF COUNSEL
"In Strickland v. Washington, supra, 466 U.S. 668 the United States Supreme Court adopted a two-part standard for evaluating claims of ineffective assistance of counsel during criminal proceedings: the defendant must show: (1) that counsel's representation fell below an objective standard of reasonableness; id., 687-88; and (2) that defense counsel's deficient performance prejudiced the defense. Id., 694. The petitioner in Strickland argued that the applicable standard for showing prejudice should be that the error impaired the presentation of the defense. The court expressly rejected that standard, concluding that it provided no workable principle. Id., 693. The court also expressly rejected the outcome-determinativestandard: that counsel's conduct more likely than not altered theoutcome in the case. Id., 693-94. `An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concernsare somewhat weaker and the appropriate standard of prejudiceshould be somewhat lower. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.' Id., 694. Accordingly, relying on the test for materiality of exculpatory information not disclosed to the defense, the court reached a compromise that requires a petitioner to demonstrate that thereis a reasonable probability that the result of the proceedingswould have been different had it not been for counsel's deficientperformance. `A reasonable probability is a probabilitysufficient to undermine confidence in the outcome.' Id." Copas v.Commissioner of Correction, 234 Conn. 139, 154-55 (1995). Emphasis added. CT Page 8537
CREDIBILITY:
Much of this court's decision is based upon the credibility of the witnesses. The court's evaluation of their credibility has been based upon their appearance and demeanor on the witness stand, the consistency and inconsistency of their testimony, their memory or lack thereof of certain events, whether they were candid and forthright or evasive and incomplete, their manner in responding to questions, their interest or lack of interest in the case, and in the case of expert witnesses, their qualifications and experience as well as all of the above-mentioned factors which applied to all witnesses.
As for Attorney Dixon, this court found him totally lacking in credibility. This is based upon his demeanor, evasiveness and attitude on the few occasions he did appear in court, on the testimony of the witnesses in this case and the exhibits and upon the evidence produced in this habeas matter as to his actions and inactions. In addition, this court does draw an adverse inference against Dixon based upon his invocation of the Fifth Amendment to The United States Constitution in refusing to testify. As is well known, a habeas corpus action is a civil proceeding. While theFifth Amendment precludes drawing adverse inferences against defendants in criminal cases, it "`does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.'"[5] LiButti v. United States, 107 F.3d 110, 121, (2ndCir. 1997), quoting Baxter v. Palmigiano, 425 U.S. 308, 318
(1976). The rule in Connecticut is the same. Olin Corp. v.Castells, 180 Conn. 49, 53-54, (1980). In the case at bar, Attorney Dixon is technically not a party to this habeas action. There is no Connecticut case law as to whether the court may draw an adverse inference against a party based upon the invocation of the Fifth Amendment privilege by a non-party witness in a civil case. To that extent this case can be considered a case of firstimpression in Connecticut.
This court finds that the rule applying to a party but not to a non-party witness is a technical distinction without a substantive difference. The attorney whose conduct or lack thereof is the one who caused the violation of the petitioner's constitutional rights. The habeas action is brought against the Warden only because he or she is charged with illegal detention of the petitioner which is, of course, in accord with a petition CT Page 8538 for habeas corpus. However, for all practical purposes, the attorney, in this case, Attorney Dixon, is a defendant in this action. Although no liability attaches to him solely on the basis of the case at bar, he is, nevertheless, the responsible party for the misconduct that would justify the granting of the petition. His misconduct is the central issue of this habeas. This court knows of no law authorizing or requiring that the attorney (Dixon) be made a party defendant, but for the purposes of the application of adverse inference rule, he should be considered a party. To preclude the adverse inference rule from being applied to him, even if there is a technical basis for it, would be fundamentally unfair to the Petitioner's right to seek redress under the Sixth Amendment to the United States Constitution and the Eighth Amendment to the Connecticut Constitution, and, therefore, a violation of his right to due process of law and a fair trial. Petitioner's right to a fair trial in this habeas matter is compromised by Dixon's use of theFifth Amendment privilege. It should not be further comprised by denying Petitioner's use of the adverse inference rule.
In LiButti v. United States, supra, decided February 21,1997, the United States Court of Appeals for the Second Circuit, (this Circuit), did consider this issue. The court stated that ". . . the admissibility of a non-party's invocation of theFifth Amendment privilege against self-incrimination in the course of civil litigation and the concomitant drawing of adverse inferences appropriately center on the circumstances of the case. . . ." (p. 123). The Court of Appeals went on to suggest a number of non-exclusive factors which should guide the trial court in making a determination of whether to draw an adverse inference from a non-party's invocation of the Fifth Amendment privilege.
"1. The Nature of the Relevant Relationships: While no particular relationship governs, the nature of the relationship will invariably be the most significant circumstance. It should be examined, however, from the perspective of a non-party witness' loyalty to the plaintiff or defendant, as the case may be. The closer the bond, whether by reason of blood, friendship or business, the less likely the non-party witness would be to render testimony in order to damage the relationship.
2. The Degree of Control of the Party Over the Non-Party Witness: The degree of control which the party has vested in the non-part witness in regard to the key facts and general subject CT Page 8539 matter of the litigation will likely inform the trial court whether the assertion of the privilege should be viewed as akin to testimony approaching admissibility under Fed.R.Evid. 801
(d)(2), and may accordingly be viewed, . . . as a vicarious admission.
3. The Compatibility of the Interests of the Party and Non-Party Witness in the Outcome of the Litigation: The trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation.
4. The Role of the Non-Party Witness in the Litigation: Whether the non-party witness was a key figure in the litigation and played a controlling role in respect to any of its underlying aspects also logically merits consideration by the trial court." Id., pp. 123-24.
In a habeas action based upon conflict of interest/ineffective assistance of counsel, the Respondent argues that the Petitioner was adequately represented by his attorney. Therefore, an inference drawn from the attorney's (Dixon's) invocation of the Fifth Amendment would be adverse to the Respondent's position.
As for the specific guidelines aforementioned this court finds as to:
 No. 1: This is really not applicable to the case at bar. Dixon, in the habeas action, had no loyalty to either party. His own self-interest in not testifying, however, is closer to the Respondent in that his testimony, if given truthfully, is more likely, as stated above, to hurt the Respondent's position. Admission of guilt would be an admission of conflict, and would, therefore be adverse to Respondent's position.
 No. 2: Neither party had "control" over the non-party witness (Dixon). However, again, if Dixon were to testify truthfully, it could be viewed as a vicarious admission of conflict.
 No. 3: Dixon is pragmatically, for the reasons stated above, a noncaptioned party in interest. The assertion of the privilege, if Dixon otherwise would have testified truthfully, would have advanced his own self-interest and that of the Respondent by not CT Page 8540 being forced to admit his guilt and/or conflict.
 No. 4: Dixon was a key figure in the criminal trial and the habeas litigation, and he played a controlling role in respect to their underlying aspects; i.e.: whether he illegally took money from the Estate and whether he had a conflict of interest.
The Appeals Court goes on to say in the next paragraph that "Whether these or other circumstances unique to a particular case are considered by the trial court, the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." Based upon the totality of the evidence, including, but not limited to, Dixon being accused of misappropriating funds from the Estate and other evidence hereinafter described, that the accusation is valid, this court finds the adverse inference to be trustworthy and that it will advance the search for the truth.
Accordingly, for all the aforementioned reasons, this court hereby draws an adverse inference against the Respondent as a result of Dixon' s invocation of his Fifth Amendment rights.
ISSUES
 Issue No. 1. Was there an actual conflict of interest in Dixon's representation of the Petitioner in the criminal case of State v. Angelo Joyner?
The court finds the following based upon the totality of the evidence:
1. Dixon was appointed administrator of the Estate of Amos Joyner (Petitioner's father) following his death in an automobile accident on or about December 6, 1986. Dixon was appointed Administrator on February 25, 1987. In December 1988 or January 1989 Dixon received $150,000 on behalf of the Estate as a result of a wrongful death claim. He commingled these funds with his own in his various checking accounts. On April 17, 1989, Dixon submitted a final accounting to the New Haven Probate Court which reflected, after deduction of attorneys's fees and administration expenses, the amount of $22,739.21 due to the Petitioner and to each of his three siblings, Antoinette Joyner, Amos Joyner, Jr. and Vigo Joyner. The final accounting was approved on May 26, 1989. CT Page 8541
2. Dixon advanced the Petitioner from the Estate $300 in December, 1988, and $100 in January, 1989 with the comment by Dixon at that time that he, Dixon, couldn't give him anymore funds because he, Dixon, was remodeling his office.
3. On or about May 10, 1989, Dixon visited Petitioner at the Whalley Avenue jail in New Haven and urged Petitioner to retain him as his attorney in the pending criminal case. Petitioner told Dixon that he wanted to retain Attorney John Williams of New Haven, who had represented him in a prior criminal case. Nonetheless, Dixon persuaded Petitioner to sign a retainer agreement (Pet. Exh. D), telling Petitioner that his (Dixon's) fee would come from Petitioner's share of the Estate. Later that day Petitioner sent a letter to Dixon, canceling the retainer agreement and discharging him as his attorney. (Pet. Exh. E). Dixon had taken the original of the agreement with him and never provided Petitioner with a copy.
4. On May 12, 1989, Dixon, having received petitioner's letter, visited him again at the jail, at which time Petitioner told Dixon that he still wanted to retain Attorney Williams because he wanted a more experienced criminal defense attorney.[6] Dixon told Petitioner that Petitioner couldn't receive his inheritance because Bergman (the victim) had brought a civil suit against him claiming $50,000 in damages, that the money was or would be tied up with this suit, and if Dixon didn't take it as his fee, Bergman would get it. Unbeknown to Petitioner, the funds were not garnished by Bergman (the PJR hearing wasn't held until June 19, 1989), and Dixon had already taken all of the remainder of Petitioner's inheritance long before May 10, 1989.[7] (Testimony of H. Bruce Fielding, C.P.A. who had, based upon this court's order to Petitioner's attorney, audited Dixon's Shawmut bank records; see transcript of habeas hearing, hereafter "HT",[8] dated May 17, 1996 pp. 117-119. This court finds that Dixon disbursed Petitioner's inheritance to himself as far back as January, 1989 when he told Petitioner he was remodeling his office. Attorney Elizabeth Curry, who initially represented Bergman in the civil suit, testified in the habeas hearing (HT May 9, 1996, pp. 122-23) that she did not initially contact Dixon about the civil suit until after May 15, 1989, at least three days after Dixon had told Petitioner that a civil suit had already been commenced and that the inheritance was or would be garnished. Attorney Daniel Adelman, who succeeded Attorney Curry in Bergman's civil suit, testified before this CT Page 8542 court (May 9, 1996 HT, p. 81) that he had deposed Dixon (Pet. Exh. M) at which time Dixon claimed that Judge John Keyes of the New Haven Probate Court had given him permission to disburse the Estate funds on May 2, 1989. Attorney Adelman also deposed Judge Keyes (Pet. Exh. N) who stated in his deposition that he did not give Dixon permission to disburse the funds on May 2, 1989 but rather gave him such permission when he approved the final accounting on May 26, 1989. Petitioner was not made aware of any of the probate proceedings, didn't know then what his inheritance was and testified that the only document he received from the Probate Court was notice of the removal of Dixon as the administrator of the Estate (HT May 3, 1996).[9] The prejudgment remedy was granted on June 19, 1989, Meadow. J., but by that time the inheritance had long been disbursed by Dixon to himself. (Pet. Exh. F — transcript of June 19, 1989 hearing). Attorney Adelman testified that he never was able to garnish Petitioner's inheritance.
5. From all of the above[10] as well as the adverse inference this court has drawn from Dixon's invocation of hisFifth Amendment rights as hereinbefore mentioned, this court concludes that Dixon illegally and unethically misappropriated Petitioner's inheritance long before he became aware of the possibility of civil litigation, in fact at least one to two months before the crimes were even committed on March 2/3, 1989 for which Petitioner was arrested and which crimes formed the basis of the civil suit. Dixon took the money, not to protect his client's money from a potential civil suit, but rather to use for his own purposes. Once he had taken the money and Petitioner was arrested on March 3, 1989, Dixon forced his representation on Petitioner in the criminal case in a desperate attempt to cover up and justify his earlier misappropriation by claiming the money as a legitimate attorney's fee. In addition, he lied to Petitioner, to Attorneys Curry and Adelman and under oath in his deposition. He certainly was less than truthful on this issue before Judge Meadow, Judge Keyes, and by lying to Judge Schimelman as to when he was authorized to disburse the Estate proceeds and by withholding the extent of his conflict, less than honest to Judge Schimelman.
6. This court further concludes that Dixon also misappropriated funds due to at least two of petitioner's siblings, Antoinette Joyner and Amos Joyner, Jr. from their inheritances from the Estate. They each were to receive the same amount as petitioner, $22,739.21. H. Bruce Fielding[11]
CT Page 8543 testified before this court on September 19, 1996 that of the $90,956.48 to be disbursed to the four siblings under the originally approved probate final accounting, only $59,424.72 was actually disbursed, leaving a balance due of $31,531.76. His accounting is as follows: (See Pet. Exh. DD):
Received By Owed to
 $16,445.90 $6,293.22 Amos Joyner, Jr. 16,979.41 5,759.71 Angelo Joyner 12,219.41 10,519.71 Antoinette Joyner 13,780.00 8,959.12 Vigo Joyner --------- ---------- Total $59,424.72 $31,531.76
However, the problem with even these amounts is that several of the checks were payable to or on behalf of these siblings and were deposited by alleged endorsements, or otherwise, back into one of Dixon's accounts. Therefore, the amounts misappropriated could be even higher. Of course, it could be argued that these monies were for legal services rendered or debts owed to Dixon. However, again, there are no retainer agreements, receipts or accountings in regard to these funds; and, of course, Dixon exercised his rights under the Fifth Amendment from which the court has drawn an adverse inference on this issue.
7. To further compound these misappropriations, Dixon engaged in an elaborate cover-up of his criminal activities. On April 8, 1996, during the pendency of this habeas trial, Dixon visited Antoinette Joyner at the Niantic Correctional Facility and persuaded her to sign a document prepared by him wherein she stated that she had received all the money due her from the Estate (Pet. Exh. GG). He told her that he would provide her later with copies of the checks and promised to buy her a new TV set and that his mother would help her out with a place to stay when she was released. She testified in this court that he had tricked her into signing the statement based upon her trust in him, and that in fact she had not received all the money due her. She further stated that she had testified to the falsity of this statement before Judge Keyes and described to him how Dixon had tricked her into signing it.
Amos Joyner, Jr., petitioner's older brother, testified in this court that he had signed a statement (Pet. Exh. HH) that he had been paid in full from the Estate. He testified that he CT Page 8544 didn't know what he was signing. An admitted alcoholic, he told this court that on April 5, 1996 at about 3 p. m. Dixon had found him in downtown New Haven and had driven him to Dixon's home, stopping on the way for Dixon to buy a fifth of scotch. He said he had probably been drinking before Dixon picked him up. He had a little to eat and a lot to drink, a lot of libation he called it. When queried by the court as to how much he had imbibed, he replied "who was counting?" He said he didn't remember how much money he had received, but that he had signed the statement without reading it because Dixon told him to sign. He believes Dixon prepared the statement. He stayed overnight and when he awoke the next morning, most of the scotch was gone.
Although he had spent some time in college as well as some time in prison in the 70s, he is clearly an individual whose life has been taken over by alcohol. From their pasts, neither sibling would appear to be a paragon of virtue. However, this court did find their testimony consistent and credible. The circumstances surrounding the obtaining of these statements clearly establishes a continuation of Dixon's pattern of conduct in taking advantage of poor, uneducated or alcohol dependent individuals who were having a difficult time with life to cover up his (Dixon's) own misdeeds. Although admittedly his theft of money from these individuals may have had only a peripheral impact on Dixon's conflict with the petitioner, it is yet another reason why Dixon did not want his scheme to steal the siblings' money and to defraud them to unravel and get him into the troubles he now faces. Further, his actions with these two siblings show a pattern of conduct that gives even more credibility to the existence of Dixon's conflict with Petitioner. In addition, this conduct with the siblings further undermines Dixon's credibility with this court which found it totally destroyed as a result of the other actions already described.
8. Petitioner presented to this court the testimony of Attorney Kathleen Eldergill of Manchester whom the court qualified as an expert witness in the field of legal ethics and the Attorney's Code of Professional Conduct. This was based upon her fifteen years in the practice of law in which she became familiar with the Code of Professional Conduct, her experience as a member of the Federal Grievance Committee which she testified uses the same rules as the State Grievance Committee, and her experience in representing complainants and respondents before the State Grievance Committee. Further, this court practiced law in the greater Hartford area for thirty-four years prior to being CT Page 8545 appointed as a Superior Court judge approximately five years ago, and in both capacities has become familiar with the Rules of Professional Conduct. The court agrees that the relevant conduct of Dixon occurring in 1989 and thereafter was subject to the current Code of Conduct which was enacted in 1986. Attorney Eldergill testified and the court agrees that:
(a) There is a violation of the Professional Code of Ethics (hereinafter "Code") when an attorney acting as the administrator of an estate does not disclose to the beneficiaries the amount of their respective shares from the estate. Rule 1.15b.[12]
(b) There is a conflict of interest when the funds are to be turned over to the client but the attorney keeps the funds for himself. Rule 1.15b
(c) When an attorney has taken the client's funds for his own use, this creates a conflict which goes right to the heart of the attorney client relationship. The primary consideration is the loyalty of the attorney to the client. Once an attorney is stealing the client's funds and taking them for his own use, you don't have that loyalty anymore; you don't have an attorney exercising independent professional judgment. HT October 10, 1996 pp. 54-55.
(d) An attorney can't knowingly acquire a pecuniary interest in the case adverse to the client; by taking funds that belong to the client, using them for his own purposes and then purporting to represent that person, the attorney has destroyed his loyalty to the client, his ability to exercise independent judgment. Rule 1.8a.
(e) Rule 1.15b is violated by not turning the monies over to the client and by not having in writing what the basis of the fee agreement is. You cannot take the client's money and then decide how much of that is going to be the fee. It's a conflict by creating a situation where the lawyers own interest is taking over in the decision making process. HT October 10, 1996 p. 57.
(f) It is a conflict if you take all of the money and spend it before you've even provided the services. HT October 10, 1996 p. 58.
(g) If taking the funds were to be considered a loan, there must be written documentation of it. CT Page 8546
(h) The funds are to be segregated from other funds of the attorney, put into an interest bearing account. You're not to take all the money up front. You're to draw it as you need it to cover your ongoing work.
(i) It is never acceptable to commingle the funds from the estate with the attorney's own funds.
(j) If an attorney decides to hold these funds from the estate for his future services as an attorney instead of spending them for further investigation which might be warranted in a criminal defense action, that's an absolute conflict of interest when the attorney's pecuniary interest thereby is in conflict with the client's interest and prejudices the client's interest. The same would be true in not using the money to buy the client street clothes to use for court appearances.
(k) If a client discharges an attorney because he wants a more experienced attorney, and the attorney talks him out of discharging him because he's already taken his money and doesn't want to give it back, that's about as clear a case as you can find of somebody putting his own interest against the interest of the client.
(l) If an attorney lies to the court about the conflict so he can stay in the case, it's another example of his putting his interest in front of the client's interest.
(m) The fact that the attorney had already stolen the client's money and spent it gives the attorney an interest in having the client lose the case because he is then in jail serving a sentence and is not in position to get his twenty-two thousand dollars back from the attorney who stole it. He is in jail, without funds, and, therefore, very unlikely to even persuade an attorney to represent him in a claim against Dixon. The attorney's actions drove a wedge between him and the client. He's no longer aligned in interest with the client. That's exactly a type of conflict of interest that I've been talking about. HT-October 10, 1996 p. 74. See generally that transcript pp. 45-91.
(n) If Dixon could not have paid petitioner his inheritance, his theft of the siblings' inheritances would also have been exposed, another reason he had to force petitioner into CT Page 8547 representing him, to cover up these thefts as well.[13]
The evidence in this case makes it abundantly clear that Dixon stole the petitioner's inheritance, and in order to keep the money, subsequently forced the petitioner to retain him for the criminal case; that Dixon's own pecuniary interest in the Estate funds that belonged to Petitioner was contrary to the Petitioner's interest; that Dixon thereby drove a wedge between himself and Petitioner and destroyed the attorney client relationship; that Dixon had no loyalty to his client and placed his own interests ahead of those of his client. Placing his own financial interests ahead of the interests of his client is the very heart of the conflict of interest. The words of the Supreme Court in Fairfield County Bar v. Taylor, 60 Conn. 11, 17, 18
(1891) apply to Dixon's conduct. ". . . once the practice becomes to him (the lawyer) a `mere brawl for life', or a system of regularized plunder where craft and not conscience is the rule, and where falsehood and not faith is the reason by which to gain his ends, then he has forfeited all right to be an officer in any court of justice or to be numbered among the members of an honorable profession."[14] The precise reason the Code exists is to prevent a crooked lawyer from taking advantage of his client.
Accordingly, this court concludes that Dixon had an actual conflict of interest in his dealings with and representation of Petitioner (his client) in the criminal trial.
Issue No. 2 Did Dixon's actual conflict of interest adversely affect his, (Dixon's) performance in representing Petitioner in the criminal case?
 1. Denied counsel of his choice: Petitioner was denied the right to counsel of his choice. Although the Sixth Amendment to the United States Constitution guarantees the right to any effective counsel and not necessarily counsel of choice, that applies primarily in situations involving public defender representation. Here, where petitioner had the funds, $22,739.21, to hire counsel of his choice long before any attempt to garnish those funds, especially if Dixon had obtained probate approval for an advance to Petitioner after the date of the arrest, March 3, 1989, which was long before any attempt to garnish the funds, (even May 10, 1989 was well prior to any garnishment action), he was entitled to use those funds to hire Attorney John Williams. His desire to do so was expressed to Dixon on May 10, 1989. CT Page 8548 Petitioner was prevented from doing so by Dixon's conduct as described above. Dixon had admitted to Petitioner on May 10, 1989 that he had never handled a criminal case of the magnitude of the one facing Petitioner. See Pet. Exh. E, Petitioner's letter to Dixon of May 10, 1989, which states in pertinent part: "I am going to use an attorney with a lot more experience. You yourselfsaid that you have never handled a case this big with so muchtime involved. I do not wish to gamble my freedom with your lack of experience." Emphasis added. As stated above, this court is well aware of Attorney Williams' wealth of experience in major criminal cases, that he is a highly respected criminal defense attorney with an impressive record of success. Dixon is a neophyte in comparison. By Dixon's conduct, his forcing his representation on Petitioner and his conflict of interest all as described above, he deprived Petitioner of Attorney Williams' services, to Petitioners detriment.
2. Failure to conduct adequate investigation: Attorney Williams (hereafter "Williams") was Petitioner's expert witness in the habeas trial. Attorney William Tiernan, also of New Haven (hereafter "Tiernan") was Respondent's expert witness. Although both have a great deal of experience in criminal defense work, this court was more impressed with the credibility of Williams than Tiernan. This is based primarily upon, although not exclusively, the manner in which they answered questions, i.e. their demeanor in responding to questions. Williams was much more flexible, candid and forthright. On many occasions, he genuinely disagreed with Petitioner's counsel's claims put forward in the form of questions. He did not hesitate to disagree and to give Dixon credit where he deemed it was warranted. Tiernan, in sharp contrast, was more rigid, less expansive and seemed determined to advance Respondent's position without exception. Although each attorney was presented by the party that called him, Tiernan showed a strong bias in favor of the Respondent whereas Williams appeared to be less biased in favor of the Petitioner. It seemed as if Williams was there to give his expert opinion no matter how it impacted the trial whereas Tiernan was there solely to support Respondent's position. His responses were just too pat.
Williams testified that Dixon was not professionally competent to handle the criminal case and that Dixon should not have used the defense of mental disease or defect, a.k.a. not guilty by reason of insanity (hereafter "NGRI") but rather should have used the defense of consent, at least as to the three counts of Sexual Assault I and Kidnapping. By using the NGRI defense, he CT Page 8549 was, in effect, admitting that the sex was not consensual. Tiernan disagreed and stated that Dixon's choice of defense was proper. Although the court agrees with Williams on this point, more importantly this court agrees with Williams that Dixon did not conduct an adequate pre-trial investigation and, therefore, was unable to make an informed decision as to which defense to use. inadequate pretrial investigation is sufficient to constitute ineffective assistance of counsel. "Failure to conduct an adequate investigation is not a matter of trial tactics. Counsel must make his decisions on an informed basis." Simeon v.Stoughton, 184 Conn. 547, 554, 556, 557 (1981). Also, seeStrickland v. Washington, supra, at p. 691.
Jim Byrd, the investigator hired by Dixon, testified in this court that he never actually spoke to Dixon, but picked up some
of the police reports from Dixon's office, that he was advised to do a preliminary investigation only and that there was not much money available for investigation in this case. Byrd did talk to some of the neighbors and provided a written report to Dixon which was unfavorable to Petitioner and for which he was paid $1,000. He testified that he expected to be called upon to conduct a further investigation. He expected to be called upon to take statements from witnesses such as Milton Simms who supported Petitioner's claim that he and Bergman lived together, had ongoing sexual relations and together used drugs and alcohol to excess. He testified that he never heard from Dixon again.
Attorney Williams testified that if a client insisted that there had been cohabitation and consensual sex by Bergman, as Petitioner told Dixon, Dixon should have made a further investigation concerning Bergman's background to determine if he could undermine her credibility. Dixon already knew from the PJR hearing of June 19, 1989, Pet. Exh. F is the transcript, that Bergman had denied under oath use of alcohol the evening of March 2/3, 1989, and that was inconsistent with her very high blood alcohol level determined at the hospital in the early morning of March 3, 1989, .251 and .254. Dixon knew that there were no significant injuries below the waist where the sexual assaults were alleged to have repeatedly occurred. Williams' testified that Dixon should have retained a medical expert to testify that the lack of any bruises on Bergman's thighs or rectum area was inconsistent with the claim of repeated sexual assaults vaginally and anally. He further testified that Dixon's knowledge through Petitioner that Bergman had had a prior claim of domestic abuse from another man, of her drug and alcohol history and CT Page 8550 inconsistencies in her statements imposed an enormous obligation on defense counsel to thoroughly investigate Bergman's background. Dixon did try to have Bergman's medical records reviewed in camera by Judge Schimelman. However, the court ruled after an evidentiary hearing that Dixon had failed to make the threshold showing necessary for an in camera review. This court finds that if Dixon had conducted a thorough investigation, he might well have had enough evidence to meet that threshold and might well have chosen a consent defense instead of a NGRI defense. Petitioner presented evidence through another investigator retained for the habeas matter that there were other witnesses still living in the area who believed that Petitioner and Bergman were living together and who had negative opinions about Bergman. These witnesses were not found by Mr. Byrd because his investigation was cut short by Dixon. Dixon did not inform Byrd of the information Dixon had and which Byrd needed to make a proper investigation. Dixon did not even have Byrd check Bergman's police record. Further, Petitioner had informed Dixon that Bergman was having problems with the Department of Children and Youth Services (DCYS) regarding custody of her minor child. She had a history of alcohol and drug abuse and went to St. Raphael's hospital for treatment in an effort to convince DCYS that she should have custody of her child. These records were not obtained by Dixon until more than a week after the criminal trial had commenced, (June 13, 1991) when Dixon was already committed to a NGRI defense. The records were not admitted into evidence, but Dixon could have learned the same information much earlier through a comprehensive investigation by a private detective. Petitioner had informed Dixon of the DCYS problem in 1989, but Dixon did nothing to investigate it.[15] If he had obtained this information prior to trial, he could have come up with a motive for Bergman claiming sexual assault. If she had admitted living with Petitioner and having consensual sex with him while her daughter was present, it would have hurt her case with DCYS. In that event, Dixon might well have chosen a consent defense. This court has looked at the hospital records, and they do show Bergman's troubles with DCYS as Petitioner had told Dixon. However, Dixon didn't meet the threshold to have them even reviewed in camera. The troubles were there, and with a comprehensive investigation Dixon probably would have met the threshold.
There was additional testimony from Williams. However, based upon all of the above, this court finds that Dixon did notconduct an adequate investigation and, therefore. was unable toCT Page 8551make an informed decision as to what defense to pursue. Because of Dixon's conflict of interest and his theft and spending of Petitioner's money, he did not have the funds to conduct the thorough investigation that was necessary to make an informed decision. He put his own financial interests ahead of his client's interest and his duty to the Petitioner. The same applies to his not retaining a medical expert as aforesaid. His conflict, therefore, adversely affected his performance in representing Petitioner in the criminal trial.
3. Intentionally allowed Petitioner to appear in prisonclothes: It is well settled law on both the federal and state levels that a defendant cannot be compelled to stand trial before a jury dressed in identifiable prison clothes. This court finds that being so dressed is particularly prejudicial in the subject criminal case in which violence against the victim is alleged. The jury is very likely to infer that a defendant in custody is dangerous and potentially violent, and this would give credence to the charges against him.
This court finds that from the totality of the evidence, the Petitioner, throughout his criminal trial before a jury, was dressed in identifiable prison clothes. There is a dispute as to whether he was in shackles, whether the shackles were seen by the jury and whether there was identification on the back of the petitioner's tee shirt showing the name of the facility in which he was confined and if so, whether the jury ever saw it. However, there is no dispute that the Petitioner was, throughout the trial, dressed in a white tee shirt and khaki pants. State's Attorney James Clark, who prosecuted the Petitioner, stated in testimony to this court that it would be very common to see a person similarly dressed walking across the New Haven Green. However, that was not the setting in which the Petitioner was seen. He was seen by the jury at the defense table sitting next to his attorney, Dixon. He was the only person in the courtroom so dressed. Every other male was either wearing a uniform, a suit or jacket and tie or something similar thereto. In addition, the Petitioner was dressed in the white tee shirt and khaki pants every day of the trial which lasted from June 4, 1991 through June 28, 1991, a period of approximately three and one half weeks, including fifteen (15) days of actual trial. Attorney Williams put it very well in his testimony before this court when he said: "When you have a trial that extends over a significant number of days and you're wearing the same thing every single day, then it becomes prison garb because we assume that our CT Page 8552 jurors are not fools." HT October 24, 1996 p. 147. This court agrees and finds that the Petitioner was dressed in identifiable prison clothes throughout his criminal trial.
However, Petitioner's attorney, Dixon, never objected to Petitioner being clothed in prison garb. "The failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation."Estelle v. Williams, 425 U.S. 954 (1976); State v. Williamson,206 Conn. 685, 704-05 (1988). Therefore, by failing to object, Dixon did not preserve the issue for appeal. If he had objected, Judge Schimelman probably would have ordered the Petitioner to be clothed in recognizable street clothes. Dixon's failure to object resulted in Petitioner being prejudiced in the eyes of the jury and, therefore, denied him his right to a fair trial and due process of law.
To further compound Dixon's misconduct, Petitioner had requested of Dixon that he provide him with a suit or other similar attire so he would not have to appear in prison clothes and Dixon refused this request. He informed Petitioner that there was no money left from Petitioner's inheritance because the funds had been garnished by Bergman in her civil suit against him. This, of course, was untrue, Dixon having stolen all the money and spent it unbeknown to Petitioner. It would have been a simple thing for Dixon to buy Petitioner inexpensive clothing, and his failure to do so gives credence to the claim that Dixon really wanted to see Petitioner convicted so he would not be in a position to discover Dixon's theft of his and his siblings' inheritances and pursue claims against Dixon for that as the court has previously described herein. At the very least Dixon did not spend money to furnish Petitioner with proper clothing because he wanted to keep all of the money he had stolen for himself. This conflict of interest in Dixon putting his own pecuniary interest ahead of his client's interest clearly adversely affected Dixon's performance in representing Petitioner in the criminal case.
Accordingly, based upon the totality of the evidence, this court finds that Petitioner has sustained his burden of proving that Dixon had an actual conflict of interest that adversely affected his performance in representing Petitioner in the criminal trial. Therefore, based upon the holdings in Cuyler,Glasser and Phillips, supra, the petition for habeas corpus CT Page 8553 should be granted.[16]
Issue No. 3 Did Dixon's representation fall below an objective standard of reasonableness?
1. Inadequate pretrial investigation is sufficient to constitute ineffective assistance of counsel. "The right to effective assistance of counsel includes an adequate investigation of the case to determine facts relevant to the merits or to the punishment in the event of conviction." Simeonv. Stoughton, 184 Conn. 547, 555 n3 (1981) cited favorably inCopas v. Commissioner of Correction, 234 Conn. 139, 154 (1995). In Copas the court found, inter-alia, that counsel's failure to investigate the viability of an Extreme Emotional Disturbance defense constituted ineffective assistance of counsel.
Here, in the case at bar, this court has already found that Dixon failed to conduct an adequate pre-trial investigation to make an informed decision as to whether to pursue a consent defense or a NGRI defense. This failure to properly investigate alone constituted ineffective assistance of counsel.
2. Failing to have Petitioner dressed in non-prison garb, which this court has already found adversely affected Dixon's performance, also constituted ineffective assistance of counsel.
3. Failure to retain his own medical expert to comment on Bergman's lack of injuries below the waist also constituted ineffective assistance of counsel.
4. The court agrees with Attorney Williams that Dixon should have pursued a consent defense if he had done adequate investigation.
5. Attorney Williams testified that he did not think Dixon was competent to handle the subject criminal trial and that he didn't think Dixon was a very good trial lawyer. His experience was so little that it falls below the necessary standards. HT October 25, 1996 p. 103.
6. Williams testified that Dixon's performance as an attorney fell below the necessary standards. HT October 25, 1996 p. 18.
7. Williams testified that Dixon's failure to conduct an adequate investigation, failure to have Petitioner in court in CT Page 8554 non-prison garb and failure to retain his own medical expert brought his performance and representation below an objective standard of reasonableness.
8. Williams also was critical of Dixon's summation. HT October 25, 1996 pp. 10-11.
 "My own opinion arrived at after reading the summation of Attorney Dixon in the context of the materials that I have reviewed prior to testifying yesterday was that sometime during the course of the trial, Attorney Dixon realized what his strategy should have been, and tried to change horses in midstream because his summation is not an insanity summation.
 His summation is a consent summation, and his problem was that because he had tried the case as an insanity case, he didn't have the factual predicates in evidence to support the argument he tried to make, and it was for that reason that some of Attorney Clark's objections were made and sustained. It's apparent to me that by the time of his summation, Attorney Dixon had figured this case out, and if he had pursued pretrial and at trial the defense which he argued in summation, he would have been doing the right thing, and he would certainly have met the standard of competent counsel, and in my opinion, might well have won the case.
 His problem was that he figured it out too late, so that by the time of the summation, he just didn't have the foundations on which to erect that structure."
The court agrees with Attorney Williams.
For all of the foregoing reasons, this court concludes that Dixon's representation fell below the objective standard of reasonableness set forth in Strickland supra.
Issue No. 4. Is there a reasonable probability that the result of the proceedings would have been different had it not been for counsel's deficient performance, a reasonable probability being a probability sufficient to undermine confidence in the outcome?
The court finds that the answer to this question is "Yes."
If Dixon had conducted an adequate investigation of Bergman and then chosen a consent defense, he would have been able to CT Page 8555 destroy her credibility, and as Attorney Williams testified (HT October 24, 1996 p. 91) Petitioner ". . . would very likely get an acquittal on all charges. I would think his chances of getting an acquittal on the sexual assault counts would have been very higher had that been pursued properly . . . I would be inclined to think you can win the kidnapping case . . . if you take away the sexual assault counts." He further testified that if a consent defense were used, Petitioner would be found guilty only of Assault I. HT October 25, 1996 p. 103.[17]
The court is not optimistic about the Petitioner being acquitted on the charge of Assault I. It does believe, based upon the totality of the evidence, that there is a reasonable probability that had it not been for Dixon's deficient performance as described above, including Dixon's allowing Petitioner to appear in court in prison clothing, Petitioner would have been acquitted on the three counts of Sexual Assault I and the one count of Kidnapping I. Therefore, the Petitioner has met his burden of proof under the standards of Strickland supra. The habeas petition should be granted for that reason as well.
Petitioner's petition for Habeas Corpus is hereby granted, the convictions and the sentences imposed in the criminal trial known as State v. Angelo Joyner, DN 89-303622, Judicial District of New Haven at New Haven are hereby vacated, and the case is remanded to the trial court for a new trial. The petitioner is ordered conditionally released from confinement. He shall be absolutely discharged from confinement unless within one hundred twenty days from the date of this Memorandum of Decision, the States' Attorney for the Judicial District of New Haven proceeds with a retrial of the Petitioner. In the event of an appeal from this decision by the Respondent, these orders are stayed until a final decision is rendered on such appeal.
Rittenband, Judge